[No. 79909-1.   En Banc.]
Argued May 15, 2007.    Decided August 30, 2007.

QWEST CORPORATION, *Respondent*, v. THE CITY OF BELLEVUE, *Appellant*.

354

*Lori M. Riordan, City Attorney,* and *Cheryl A. Zakrzewski, Assistant* (*Kenneth Brunetti* of *Miller & Van Eaton, LLP,* of counsel), for appellant.

*David M. Jacobson* (of *Dorsey & Whitney, LLP*), for respondent.

¶1 SANDERS, J. — The city of Bellevue (City) challenges a summary judgment order prohibiting the City from assessing a utility occupation tax[1] (UOT) to Qwest Corporation on (1) charges for access to interstate service, including but not limited to, customer access line charges[2] (CALCs) imposed pursuant to 47 C.F.R. pt. 69[3] and private line, frame relay, and ATM (asynchronous transfer mode) charges[4] purchased under a Federal Communications Commission (FCC) tariff; (2) charges for interstate services; or (3) federally tariffed charges. We reject the City's arguments and affirm the trial court's order.

## FACTS

¶2 Qwest provides interstate[5] and intrastate[6] network telephone services to customers in various locations includ-

---

[1] The City's utility occupation tax is imposed pursuant to the "Utility Occupation Tax Code." Ch. 4.10 BELLEVUE CITY CODE.

[2] The final judgment for Qwest refers to a CALC as a *"consumer* access line charge." Clerk's Papers at 425 (emphasis added). Both Qwest and the City, however, refer to CALCs as *"customer* access line charges" in their briefs. We will refer to the charges at issue as "customer access line charges," as that appears to be the term most commonly used. *See Qwest Corp. v. State ex rel. Dep't of Revenue*, 2006 WY 35, 130 P.3d 507, 516; *AT&T Commc'ns of Mountain States v. State*, 778 P.2d 677, 680 (Colo. 1989).

[3] Federal Communications Commission access charges, 47 C.F.R. § 69.1(a), "establishes rules for access charges for interstate or foreign access services provided by telephone companies on or after January 1, 1984."

[4] Private line service, ATM service, and frame relay service are simply different methods for transporting data. *See* NEWTON'S TELECOM DICTIONARY 69-71, 350, 658 (15th ed. 1999).

[5] "The term 'interstate communication' or 'interstate transmission' means communication or transmission (A) from any State, Territory, or possession of the United States (other than [the Philippine Islands and] the Canal Zone), or the District of Columbia, to any other State, Territory, or possession of the United States (other than [the Philippine Islands and] the Canal Zone), or the District of Columbia, (B) from or to the United States to or from [the Philippine Islands or] the Canal Zone, insofar as such communication or transmission takes place within the United States, or (C) between points within the United States but through a foreign country; but shall not, with respect to the provisions of subchapter II of this chapter [47 U.S.C. §§ 201-276] (other than section 223), include wire or radio communication between points in the same State, Territory, or possession of the United States, or the District of Columbia, through any place outside thereof, if such communication is regulated by a State commission." 47 U.S.C. § 153(22).

[6] "Intrastate" is defined as "[s]ervices, traffic or facilities that originate and terminate within the same state." NEWTON'S, *supra*, at 438.

ing Bellevue, Washington. Qwest is subject to regulation by the FCC and the Washington Utilities and Transportation Commission (WUTC) with respect to telephone services provided to customers in Bellevue.

¶3 In November 2004 Qwest learned the City planned to conduct an audit review of the UOT and business and occupation tax Qwest owed. During the course of the audit, a dispute arose as to whether the City could levy UOTs on certain telecommunications service charges. On October 11, 2005, prior to the City's issuance of its tax assessment, Qwest filed a complaint in King County Superior Court challenging the imposition of the City's UOT on CALCs and other access charges.

¶4 On October 28, 2005, the City issued its tax assessment against Qwest. The assessment stated Qwest owed the City a total of $5,809,517.09 in taxes, penalties, and interest. On November 23, 2005, Qwest filed a notice of appeal with the Bellevue hearing examiner pursuant to Bellevue City Code (BCC) section 4.03.140, challenging the assessment. Qwest's notice of appeal addressed, among other things, several issues raised in its complaint, including the City's erroneous inclusion of CALCs and other interstate access charges in Qwest's taxable base.[7]

¶5 On December 9, 2005, the City filed a motion to dismiss in superior court, arguing Qwest had failed to exhaust its administrative remedies through its administrative appeal to the hearing examiner. Qwest filed an opposition to the City's motion to dismiss and cross-moved for summary judgment. In response, the City filed a Civil Rule (CR) 56(f) motion for continuance, asking for 120 days

---

[7] On June 5, 2006, Qwest moved for partial summary judgment in its administrative appeal. Qwest's motion was based on the superior court's grant of summary judgment on some of the issues before the hearing examiner. The City moved for an order to stay proceedings in the administrative appeal until after determination of the City's appeal of the superior court's decision. The hearing examiner granted Qwest's motion for partial summary judgment and denied the City's motion to stay. The partial summary judgment order was set aside in the event the superior court's decision was reversed. The hearing examiner then directed the parties to agree to a hearing date for a determination of the remaining issues.

to conduct discovery. The trial court denied the City's motion for continuance. In March 2006 the court granted Qwest's cross motion for summary judgment and denied the City's motion to dismiss. The City filed a motion for reconsideration on April 7, 2006, which the court denied. Final judgment for Qwest was entered on June 1, 2006. The City appealed. Division One of the Court of Appeals certified the case to this court pursuant to RCW 2.06.030(d),[8] and we accepted certification.

## STANDARD OF REVIEW

■ ¶6 We review a trial court's grant of summary judgment de novo. *Hubbard v. Spokane County*, 146 Wn.2d 699, 706, 50 P.3d 602 (2002). Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); *Hubbard*, 146 Wn.2d at 707. A grant of summary judgment is proper if reasonable persons could reach only one conclusion from the evidence presented. *Id*. Facts and reasonable inferences therefrom are construed in favor of the nonmoving party. *Id*.

¶7 A trial court's grant or denial of a motion for continuance is reviewed for abuse of discretion, *State v. Hurd*, 127 Wn.2d 592, 594, 902 P.2d 651 (1995), as is review of a trial court's denial of a motion to dismiss, *State v. Goodchild*, 146 Wash. 81, 261 P. 786 (1927). Statutory interpretation is a question of law and review is de novo. *State v. Ammons*, 136 Wn.2d 453, 456, 963 P.2d 812 (1998).

## ANALYSIS

I. Whether CALCs and Private Line, Frame Relay, and ATM Access Charges Are Charges for Access to Interstate Service Is a Question of Law

¶8 The FCC has exclusive jurisdiction over and regulates Qwest's *interstate* telecommunications activity. 47

---

[8] RCW 2.06.030(d) vests the Court of Appeals with "exclusive appellate jurisdiction in all cases except . . . cases involving fundamental and urgent issues of broad public import requiring prompt and ultimate determination . . . ."

U.S.C. § 152. The WUTC has exclusive jurisdiction over and regulates Qwest's *intrastate* telecommunications activity in Washington. RCW 80.36.100. It is undisputed that under state law, the City may tax Qwest's charges for and its provision of access to *intrastate* services. *See* RCW 35A.82.060(1) ("Any code city . . . may impose the fee or tax, if it desires, on one hundred percent of the total gross revenue derived from intrastate toll telephone services . . . ."). And in their initial briefs, both Qwest and the City agreed the City could *not* tax Qwest on charges for *interstate* services. *See* RCW 35A.82.060(1) (precluding cities from taxing charges "for access to, or charges for, interstate services").[9] The City even conceded the trial court "properly held that the statute prohibits taxing 'charges for access to interstate services.' " Reply Br. of Appellant at 6.

¶9 The City disputes the trial court's ruling to the extent it holds CALCs, private line, frame relay, ATM charges, and other federally tariffed charges are *necessarily* charges for *interstate* services (or charges for *access* to interstate services). The City believes a court cannot make this determination without "conducting any factual analysis as to the true nature of the charges." Reply Br. of Appellant at 3; *see also id.* at 11 ("[J]ust because a charge is federally tariffed does not mean that it is being imposed for access to or for interstate service as a matter of law."). The City explains it "seeks [only] to tax charges for service . . . that is wholly *intrastate* in nature."[10] Br. of Appellant at 14. The City argues, however, it has no way of knowing whether certain

[9] BCC 4.10.050(C) mirrors the state statute and provides, "the following items may be deducted from the measure of the tax: . . . . That portion of the gross income derived from charges to another telecommunications company for connecting fees, switching charges, or carrier access charges relating to intrastate toll telephone services, or *for access to, or charges for, interstate services*." (Emphasis added.) Qwest explains the prohibition on taxes for interstate services is the exact declaratory ruling Qwest sought in its complaint and the Superior Court granted.

[10] The City declares, "[T]he Superior Court erred to the extent it concluded that federal law, including the FCC's superior regulatory jurisdiction, renders invalid the City's levy of the UOT on Qwest's *intrastate* services." Br. of Appellant at 22 (emphasis added). The City then explains state law does not prohibit the City from levying its UOT on intrastate services. Qwest, however, concedes this point and the City's briefing on this issue is unnecessary.

private line, frame relay, and ATM services provided by Qwest were intrastate or interstate in nature. It believes the issue of whether these services are interstate or intrastate is a question of fact that will vary on a case by case basis. In a nutshell, the City appears to believe Qwest is concealing certain "intrastate charges" (subject to the UOT) under the guise of services Qwest labels as "interstate." *See* Br. of Appellant at 29 ("at least some of the revenues being reported by Qwest as CALCs are not in fact charges for access to interstate services authorized by the FCC [and] to the extent such charges are not actually charges for interstate service or access to interstate service, they are charges for intrastate services and accordingly are subject to the UOT"); *see also id.* at 27 ("[T]he charges Qwest labels 'customer access line charges' are not necessarily charges for, or access to, interstate services, just because Qwest gives them this label.").

¶10 The City states it used its own records to "determine that certain of the dedicated line connections the City purchased from Qwest (using frame relay technology) were used to connect City offices with each other and with other regional offices located entirely within the State of Washington." Br. of Appellant at 25-26. The City's evidence consists of four invoices for frame relay connections between the City and other local agencies. The *actual use* of the circuits is entirely for *intrastate* communications. However, evidently when the City signed up for the frame relay services, it indicated it would use such services for *interstate* communications—hence, Qwest labeled the account as interstate.[11]

¶11 According to Qwest, the City incorrectly assumes one determines the interstate or intrastate nature of a service charge by looking to the customer's use of the service. Qwest explains that according to the FCC, certain services are labeled "interstate" or "intrastate" depending

---

[11] Qwest explains, "all of the charges at issue in this case are imposed pursuant to FCC regulations to compensate Qwest for providing *access* to the national interstate telephone network." Qwest Resp. Br. at 29 (emphasis added).

upon the customer's initial indication of how they *plan* to use the service and not how the service is subsequently used. Thus, the trial court's order "did not depend on whether the services upon which CALCs and other federal access charges are imposed occur between Washington and some other state" because "access charges imposed pursuant to federal tariff are by law charges imposed on access to interstate service." Qwest Resp. Br. at 34.

¶12 Qwest's FCC tariff clarifies that certain "types of dedicated communication connections such as private line transport, frame relay, and ATM products" may be used by customers to "access a local network, an interstate network, or for mixed use." Qwest Resp. Br. at 7-8. "If the customer's estimate of the interstate traffic on the service involved constitutes more than 10% of the total traffic on that service," the service is regulated under Qwest's interstate access FCC tariff. Clerk's Papers (CP) at 358 (Qwest FCC Tariff No. 1). By contrast, "[i]f the customer's estimate of the interstate traffic on the service involved constitutes 10% or less of the total traffic on that service, the service will be provided in accordance with the appropriate intrastate rules and regulations," i.e., such service is subject to regulation under the WUTC. *Id.*

¶13 To summarize, whether the FCC or the WUTC has jurisdiction over certain charges (i.e., whether the charges are for access to interstate or intrastate service) is not determined by looking to the customer's use of the connections. Instead, whether charges are charges for access to interstate (as opposed to intrastate) service is a question of law, and the City's contention that a court must conduct factual analysis to determine the interstate or intrastate nature of the charges is erroneous.

## II. Access Charges Imposed Pursuant to Federal Tariff Are by Law Charges Imposed on Access to Interstate Service

¶14 The City also challenges the superior court's holding to the extent it precludes the City from assessing a

UOT on Qwest's federally tariffed charges. The City argues the proper test under RCW 35A.82.060(1) (for determining whether the City may impose a UOT) is whether the tax is " 'for access to, or charges for, interstate services,' " *not* whether a tax is subject to an FCC tariff. Br. of Appellant at 30 (quoting RCW 35A.82.060(1)). It claims this interpretation is bolstered by the statute's legislative history. We turn to that history now.

¶15 Former RCW 35A.82.060 (1983) provided,

> [T]he city shall not impose the fee or tax on that portion of network telephone service . . . which represents access to, or charges for, interstate services *for which rates are contained in tariffs filed with the federal communications commission*.

LAWS OF 1983, 2d Ex. Sess., ch. 3, § 38 (emphasis added). The legislature subsequently struck the italicized language from the statute, and the City takes this omission as an indication that the statute's test is not the existence of FCC tariffs but whether the service in question is, in fact, interstate.

¶16 First, while the City regards the legislature's omission as a *limitation*, the omission is more properly read as an *expansion* on the taxation exemption. That is, under the amended version of the statute, *all* interstate services are exempt from taxation, not simply those for which rates are contained in tariffs filed with the FCC. Second, as mentioned above, we agree with Qwest's position that "access charges imposed pursuant to federal tariff are *by law* charges imposed on access to interstate service." Qwest Resp. Br. at 34 (emphasis added).

¶17 47 U.S.C. § 154 vests the FCC with the power to regulate interstate telecommunications, and 47 U.S.C. § 203 requires common telecommunication carriers to file their rates, or tariffs, with the FCC. Accordingly, tariffs properly filed with the FCC consist of charges that are necessarily charges for interstate telecommunications services, as 47 U.S.C. § 152 applies "to *all* interstate and foreign communication" and such interstate service charges are exempt from municipal taxation under RCW 35A.82.060(1).

Moreover, the FCC lacks jurisdiction with regard to intrastate communication services. *See* 47 U.S.C. § 152 ("[N]othing in this chapter shall be construed to apply or to give the Commission jurisdiction with respect to . . . charges . . . for or in connection with *intrastate* communication service . . . ." (emphasis added)).

¶18 As such, we agree with Qwest that tariffs properly filed with the FCC include charges that are *necessarily* interstate in nature and affirm the trial court's order precluding the City from taxing Qwest's federally tariffed charges.

## III.   RCW 35A.82.060(1) Forbids City Taxation on Interstate Services

¶19 As mentioned earlier, in their initial briefs, both parties agreed RCW 35A.82.060(1) prohibits code cities from imposing taxes on *any* charges "for access to, or charges for, interstate services." RCW 35A.82.060(1). Subsequent to the parties' initial briefs, however, the Court of Appeals interpreted RCW 35.21.714 (a statute substantively identical to RCW 35A.82.060)[12] as precluding tax on charges for interstate services *only when those charges are to another telecommunications company. See Cmty. Telecable of Seattle, Inc. v. City of Seattle*, 136 Wn. App. 169, 181, 149 P.3d 380 (2006).

¶20 A court's "fundamental objective in construing a statute is to ascertain and carry out the legislature's intent." *Arborwood Idaho, LLC v. City of Kennewick*, 151 Wn.2d 359, 367, 89 P.3d 217 (2004). Review begins with the plain meaning of the statute. *Lacey Nursing Ctr., Inc. v. Dep't of Revenue*, 128 Wn.2d 40, 53, 905 P.2d 338 (1995). If a statute is ambiguous, we may look to the legislative history and the circumstances surrounding the statute's enactment to discern legislative intent. *Rest. Dev., Inc. v.*

---

[12] The only difference between the two statutes is that RCW 35A.82.060 applies to code cities whereas RCW 35.21.714(1) applies to noncode cities. Qwest and the City agree the statutes share identical legislative history.

*Cananwill, Inc.*, 150 Wn.2d 674, 682, 80 P.3d 598 (2003). "Ambiguities in taxing statutes are construed 'most strongly against the government and in favor of the taxpayer.'" *Estate of Hemphill v. Dep't of Revenue*, 153 Wn.2d 544, 552, 105 P.3d 391 (2005) (quoting *Dep't of Revenue v. Hoppe*, 82 Wn.2d 549, 552, 512 P.2d 1094 (1973)).

¶21 Because the Court of Appeals' interpretation of RCW 35A.82.060(1) conflicts with the initial reading of both parties, we turn to the legislative history for guidance.

¶22 The version of RCW 35A.82.060(1) relevant to this action reads,

> Any code city which imposes a license fee or tax upon the business activity of engaging in the telephone business which is measured by gross receipts or gross income may impose the fee or tax, if it desires, on one hundred percent of the total gross revenue derived from intrastate toll telephone services subject to the fee or tax: PROVIDED, That the city shall not impose the fee or tax on that portion of network telephone service which represents charges to another telecommunications company, as defined in RCW 80.04.010, for connecting fees, switching charges, or carrier access charges relating to intrastate toll telephone services, or for access to, or charges for, interstate services, or charges for network telephone service that is purchased for the purpose of resale, or charges for mobile telecommunications services provided to customers whose place of primary use is not within the city.

LAWS OF 2002, ch. 67, § 10. Because it is undisputed the City may impose a UOT on Qwest's revenue derived from charges for *intrastate* services, only the language following the word "PROVIDED" is necessary for resolution of this case.

¶23 In *Community Telecable*, 136 Wn. App. at 181, Comcast argued a Seattle tax on telephone business was "illegal because RCW 35.21.714 prohibits cities from imposing their telephone utility taxes *on interstate service.*" (Emphasis added.) The Court of Appeals disagreed, holding that the statute merely "requires cities to give a deduction for the portion of network telephone service that represents

a *charge to another telecommunications company* for interstate services." *Id.* at 182 (emphasis added). In short, the court read charges for "access to, or charges for, interstate services" as a subset of charges to another telecommunications company. The Court of Appeals concluded, "Comcast has not shown, or even alleged, that it charges another telecommunications company for interstate services." *Id.*

¶24 After *Community Telecable* was published, the City filed a statement of additional authority.[13] Abandoning its initial reading of the statute, the City now cites *Community Telecable* for the proposition that RCW 35A.82.060(1) *does not* in fact bar the taxation of interstate telecommunications services. Instead, contends the City, *Community Telecable* allows the City to assess the UOT on Qwest's charges *unless Qwest demonstrates such charges are to another communications company.*

¶25 Qwest maintains its position that the plain language of RCW 35A.82.060(1) and RCW 35.21.714(1) prohibits code cities and cities from taxing *any* charges for interstate services or for access to interstate services, not just charges to other telecommunications companies for interstate services. Qwest urges us to ignore *Community Telecable*'s interpretation of RCW 35.21.714(1), arguing, "(1) the panel's interpretation of RCW 35.21.714(1) is manifestly erroneous; (2) the interpretation is not identified as a holding in the case;[14] and (3) the interpretation responds to an issue that was not properly before the court." Qwest Suppl. Br. at 3. Qwest further argues the statute's legislative history indicates that prohibiting cities from taxing charges to other telecommunications companies was a *separate exception* to the affirmative grant of taxing power

---

[13] Qwest then submitted a motion to submit additional briefing, which the Court of Appeals granted.

[14] *Community Telecable*, 136 Wn. App. at 172, held Seattle's telephone utility tax as applied to Comcast's Internet transmission activities (1) is not barred by the Washington Internet tax moratorium, (2) is exempt from the federal Internet Tax Freedom Act's (47 U.S.C. § 151) moratorium on taxes on Internet access under a grandfather clause, and (3) is not discriminatory under the federal Internet Tax Freedom Act.

and was not intended to limit or affect the prior statutory language prohibiting cities from taxing charges for "access to, or charges for, interstate services." We agree the legislative history of RCW 35A.82.060(1) supports this position.

¶26 The original statute, passed in 1981, read,

> Any code city which imposes a license fee or tax upon the business activity of engaging in the telephone business, as defined in RCW 82.16.010, which is measured by gross receipts or gross income may impose the fee or tax, if it desires, on one hundred percent of the total gross revenue derived from toll telephone services subject to the fee or tax.

LAWS OF 1981, ch. 144, § 11. Thus, the 1981 version of the statute made no distinction between interstate and intrastate services and simply allowed municipalities to tax "the total gross revenue derived from toll telephone services." *Id.*

¶27 In 1983 the statute was amended to read,

> Any code city which imposes a license fee or tax upon the business activity of engaging in the telephone business, as defined in section 24 of this 1983 act, which is measured by gross receipts or gross income may impose the fee or tax, if it desires, on one hundred percent of the total gross revenue derived from intrastate toll telephone services subject to the fee or tax: PROVIDED, That the city shall not impose the fee or tax on that portion of network telephone service, as defined in section 24 of this 1983 act, which represents access to, or charges for, interstate services for which rates are contained in tariffs filed with the federal communications commission.

LAWS OF 1983, 2d Ex. Sess., ch. 3, § 38. The legislature clarified cities may tax 100 percent of revenue derived from *intrastate* telephone services and added a limitation on cities' taxing power—namely, cities *may not* tax the portion of telephone service "which represents access to, or charges for, interstate services" for which rates are filed with the FCC. *Id.*

¶28 In 1986 the statute was amended to include the exemption regarding telecommunications companies. The 1986 version provides

[a]ny code city which imposes a license fee or tax upon the business activity of engaging in the telephone business, as defined in RCW 82.04.065, which is measured by gross receipts or gross income may impose the fee or tax, if it desires, on one hundred percent of the total gross revenue derived from intrastate toll telephone services subject to the fee or tax: PROVIDED, That the city shall not impose the fee or tax on that portion of network telephone service, as defined in RCW 82.04.065, which represents charges to another telecommunications company, as defined in RCW 80.04.010, for connecting fees, switching charges, or carrier access charges relating to intrastate toll telephone services, or for access to, or charges for, interstate services.

LAWS OF 1986, ch. 70, § 4.[15] In addition to adding the exemption regarding charges to other telecommunications companies, the legislature omitted the modifier "for which rates are contained in tariffs filed with the federal communications commission." Under the 1986 version, "access to, or charges for, interstate services" can be read as either a subset of "charges to another telecommunications company" or a stand-alone, independent limitation on code cities' taxing power.

¶29 The statute's legislative history, however, persuades us that the 1986 amendment affected only *intrastate* charges and left "access to, or charges for, interstate services" as a separate exemption. The impetus for the 1986 amendment was the breakup of the American Telephone & Telegraph Company (AT&T).[16] The local government fiscal note summarizing the 1986 bill amending RCW 35A.82.060 provides, "[t]his bill states that cities shall not tax that

---

[15] The statute was amended again in 1989, 2002, and 2007. These amendments, however, are not relevant to the determination of the issues at bar.

[16] *See Qwest Corp.*, 130 P.3d at 512 ("Many important aspects of modern telecommunications law developed in the wake of the breakup of the AT & T monopoly. In 1982, a Modified Final Judgment (MJF) entered in the case *United States v. AT & T*, 552 F.Supp. 131 (D.D.C.1982), *aff'd sub nom.*, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983) changed the telecommunications industry by requiring the breakup of telephone companies so that no one company can provide both interstate and intrastate services.").

portion of network telephone service which represents certain charges to another telecommunication company." Local Gov't Fiscal Note to S.B. 4945 (Substitute H.B. 1892), 49th Leg., Reg Sess. (Wash. 1986) (prepared by Dep't of Cmty. Dev.). The note explains the amendment was necessary in part because "cities are currently double taxing consumers for the provision of telephone service." *Id.*[17] It provides:

> Since the breakup of AT&T, monthly phone bills issue[d] by Pacific Northwest Bell (PNB) are comprised of charges from two separate companies, PNB and a long distance carrier. *Cities collect taxes on intrastate long distance revenue.* Since the divestive [sic], according to PNB, cities are collecting taxes on intrastate long distance from both the long distance companies themselves and from PNB who incorporates these charges into their total bill to consumers. Hence the double taxation.

*Id.* (emphasis added). Importantly, the final bill report reads, "[I]nterstate *services continue to be exempt from taxation by cities.*" FINAL B. REP. on Substitute H.B. 1892, 49th Leg., Reg. Sess. (Wash. 1986), "Limiting the taxation of telecommunications services by cities . . . As Passed Legislature." (Emphasis added.) Qwest contends, and we agree, this clarification confirms "[t]he 1986 amendment cannot be construed as allowing cities to tax revenue derived from access to interstate services or interstate services." Qwest Suppl. Br. at 8.

¶30 We disapprove of the Court of Appeals' interpretation of RCW 35A.82.060(1), as the statute's legislative history supports the conclusion that RCW 35A.82.060(1) precludes city taxation of charges for interstate service *regardless* of whether those charges are to another telecommunications company.

---

[17] *See also* FINAL B. REP. on Substitute H.B. 1892, 49th Leg., Reg. Sess. at (Wash. 1986) ("[W]ith the AT&T divestiture two years ago, separate local and long distance companies emerged. One arrangement of the divestiture was that long distance companies would pay an access charge to the local company to make interconnections. Cities impose utility taxes on both local and long distance companies for calls within the state. Both companies pay taxes on the same access charges.").

## IV. The Trial Court's Denial of the City's Motion for Continuance Was Not an Abuse of Discretion

¶31 We review a trial court's denial of a motion for continuance for abuse of discretion. *Colwell v. Holy Family Hosp.*, 104 Wn. App. 606, 615, 15 P.3d 210 (2001). A trial court abuses its discretion if it "exercised its discretion on untenable grounds or for untenable reasons," or if the discretionary act was "manifestly unreasonable." *Lindgren v. Lindgren*, 58 Wn. App. 588, 595, 794 P.2d 526 (1990).

¶32 The City sought a continuation of 120 days in order to conduct discovery "into whether or not charges Qwest identifies as CALCs and charges for certain other services provided by Qwest, including ATM service, frame relay service, and private line service, were *interstate* or *intrastate* in nature." Br. of Appellant at 32. Qwest argued because its complaint raised purely legal issues, fact discovery was irrelevant to the determination of the case. Qwest's position is correct.

¶33 A trial court may deny a motion for continuance when:

> (1) the requesting party does not have a good reason for the delay in obtaining the evidence, (2) the requesting party does not indicate what evidence would be established by further discovery, or (3) the new evidence would not raise a genuine issue of fact.

*Butler v. Joy*, 116 Wn. App. 291, 299, 65 P.3d 671 (2003). Under this test, the City fails prongs 1 and 2 because whether a charge is for interstate or intrastate service is a matter of law, and therefore an investigation into the "true nature" of Qwest's service charges is unnecessary and irrelevant. Br. of Appellant at 7.

¶34 Further, the superior court's holding was not dependent upon whether or not Qwest accurately labeled its

service charges.[18] The trial court held the City shall not assess to Qwest a UOT on "(1) *charges for access to interstate service,* including but not limited to, consumer access line charges imposed pursuant to 47 C.F.R. pt. 69 and private line, frame relay, and ATM access charges purchased under a Federal Communications Commission tariff; (2) charges for interstate services; or (3) federally tariffed charges." CP at 424-26 (Final J. for Qwest Corp.) (emphasis added). As Qwest properly notes, "[t]he Superior Court's order is a holding about the legal right of the City to tax interstate access charges, irrespective of what Qwest or the City calls them." Qwest Resp. Br. at 2 n.1.

¶35 Accordingly, it was not an abuse of discretion for the trial court to deny the City's motion for a continuance.

## V. The Trial Court's Denial of the City's Motion To Dismiss Was Not an Abuse of Discretion

¶36 We review a trial court's denial of a motion to dismiss for abuse of discretion. *Reeves v. City of Wenatchee,* 130 Wn. App. 153, 155, 121 P.3d 777 (2005). A trial court abuses its discretion if it "exercised its discretion on untenable grounds or for untenable reasons," or if "the discretionary act was manifestly unreasonable." *Lindgren,* 58 Wn. App. at 595.

¶37 The City argued Qwest's lawsuit was "premature" and "the superior court should have given the Hearing Examiner the chance to complete its administrative review before permitting Qwest to proceed with its lawsuit." Br. of Appellant at 36. The City contends, "under Washington law,

---

[18] And as Qwest and the City rightly point out, the integrity or accuracy of Qwest's accounting procedures is a separate issue entirely. *See* Reply Br. of Appellant at 19 n.14 ("[T]he question of whether there are errors in Qwest's tariff filings with the FCC and the WUTC is beyond the scope of this proceeding."); *see also* Qwest Resp. Br. at 2 (Qwest "does not seek a factual determination either about whether the data it provided to the City in the tax audit is accurate or whether the City's classification of that data is accurate. . . . Qwest seeks the Court's declaration that as a matter of law the City cannot tax charges for access to interstate services.").

a party must exhaust it[s] administrative remedies before challenging an administrative action in court." Br. of Appellant at 36-37.

¶38 But Qwest explains it did not invoke the Superior Court's *appellate* jurisdiction over a decision by the City hearing examiner or Department of Finance.[19] Instead, Qwest explains, it "invoked the Superior Court's *original* jurisdiction, pursuant to the Uniform Declaratory Judgments Act, RCW 7.24.010, and the Washington Constitution, Article IV, Section 6 and RCW 2.08.010, which vest the Superior Court with original jurisdiction over all cases involving the 'legality of any tax, impost, assessment, toll or municipal fine.'" Qwest Resp. Br. at 37 (emphasis added). And Qwest cites *Chaney v. Fetterly*, 100 Wn. App. 140, 145, 995 P.2d 1284 (2000) for the proposition that where a court has original jurisdiction over a dispute, the administrative exhaustion requirement does not apply.

¶39 Qwest also correctly notes that this case involves an issue of statutory interpretation, and courts have held that questions of statutory interpretation need not be referred to administrative agencies. *See State ex rel. Graham v. Northshore Sch. Dist. No. 417*, 99 Wn.2d 232, 242, 662 P.2d 38 (1983). The City concedes this point. Further, as recognized by a panel of the Court of Appeals, the case at bar "involves issues of broad public import which require prompt and ultimate determination." *See* Wash. State Court of Appeals Order of Certification, *Qwest Corp. v. City of Bellevue*, No. 58154-6-I (Mar. 9, 2007) (citing RCW 2.06.030(d)). As such, the trial court did not abuse its discretion in denying the City's motion to dismiss.

## CONCLUSION

¶40 RCW 35A.82.060(1) precludes city taxation on revenue derived from charges for interstate service or for

---

[19] In fact, invoking the Superior Court's appellate jurisdiction over the hearing examiner's decision would have made no sense, as the hearing examiner had not yet reached a decision when Qwest filed its lawsuit.

access to interstate service. Because this case involved no genuine issue of material fact and because Qwest is entitled to judgment as a matter of law, the trial court's grant of summary judgment is affirmed. We also affirm the trial court's denial of the City's motion for reconsideration.

ALEXANDER, C.J., and C. JOHNSON, MADSEN, BRIDGE, CHAMBERS, OWENS, FAIRHURST, and J.M. JOHNSON, JJ., concur.