IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| THOMAS INDUSTRIAL COATINGS, | ) | No. 38679-1-III |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| DIX CORPORATION, | ) | |
| | ) | |
| Respondent. | ) | |

PENNELL, J. — Thomas Industrial Coatings (TIC) appeals from an adverse

summary judgment order, dismissing its breach of contract claim against Dix

Corporation, and final judgment. Because there are contested issues of material fact

as to Dix's contract obligations, we reverse and remand for further proceedings.

FACTS

*United States Army Corps of Engineers solicitation for bids*

The Garrison Dam, located on the Upper Missouri River in North Dakota, is

operated by the United States Army Corps of Engineers (Corps). In April 2012, the

Corps sought bids from contractors for its spillway gates rehabilitation project (Project).

To do so, the Corps published a project solicitation (Solicitation) that contained specifications and guidelines for bidding contractors.

The Solicitation stated the Corps intended "to evaluate proposals and award a contract without discussions with offerors" and, therefore, "the offeror's initial proposal should contain the offeror's best terms. . . ." Clerk's Papers (CP) at 765. It further advised, "[e]xchanges with offerors after receipt of a proposal do not constitute a rejection or counteroffer by the Government." *Id*. The Solicitation also noted, "[a] written award or acceptance of proposal mailed or otherwise furnished to the successful offeror within the time specified in the proposal shall result in a binding contract without further action by either party." *Id*. at 766. The Solicitation directed offerors to provide a comprehensive project management plan (PMP), that would "become an integral part of the resultant contract." *Id*. at 794.

The Solicitation notified offerors that access to spillway gates was limited due to a finite number of "stoplogs," which are employed to block river water and allow contractors to access the dam's gates to perform rehabilitation work. *Id*. at 953. Section 1.2.2 of the Solicitation stated:

> There are a total of 18 stoplog sections. They are identical and interchangeable. Due to water heights, stoplogs can only be utilized at one, maybe two, spillway gate locations at one time—the Contractor

will be required to discuss how gate rehabilitation will be scheduled around this restriction in the proposed work plan.

*Id*. The Solicitation also included four addendums. The second addendum contained a provision titled "Design-Build Contract—Order of Precedence," which stated:

(a) The contract includes the standard contract clauses and schedules current at the time of contract award. It entails (1) the solicitation in its entirety, including all drawings, cuts, and illustrations, and any amendments, and (2) the successful offeror's accepted proposal. The contract constitutes and defines the entire agreement between the Contractor and the Government. No documentation shall be omitted which in any way bears upon the terms of that agreement.

(b) In the event of conflict or inconsistency between any of the provisions of this contract, precedence shall be given in the following order: (1) Betterments: Any portion of the accepted proposal, which both conform to and exceed the provisions of the solicitation. "Betterment" is defined as any product, component, or system, which exceeds the requirements stated in the solicitation.

*Id*. at 303.

*Proposal submitted by Dix*

In May 2012, S&S Coatings, Inc. and Dix Corporation (collectively "Dix") submitted a performance proposal (Proposal). Per the Solicitation, the Proposal contained a PMP. Within the PMP, Dix included a "Comprehensive Work Plan." *Id*. at 158. Under the heading "Overall Project Approach," the Proposal stated:

The [Dix] team proposes to design and construct additional stop logs to allow a total of four (4) gates to be under various stages of rehabilitation at one time. Based on our schedule for design and construction sequencing,

3

> our investment in additional stop log capacity will allow our team to
> complete the project a full six (6) months early.

*Id*. Further, under the heading "Preconstruction," the Proposal stated Dix would conduct

initial inspection "four gates at a time." *Id*.

*The Corps awards contract to Dix*

The Corps awarded Dix the Project contract in July 2012. The award was made

via execution of Standard Form 1442, "Solicitation, Offer, and Award." *Id*. at 270-71.

The award letter does not specifically mention Dix's offer to construct additional

stoplogs.

In December 2012, the Corps sent Dix a letter stating the initial project schedule

was not considered acceptable as submitted and identified a number of deficiencies.

One of the comments listed in the letter was that "additional stoplogs identified in

[Dix's] technical proposal prior to award do not appear to be included." *Id.* at 168.

A few days later, in response to a payment request made by Dix, the Corps sent

another letter, stating:

> Reference recent conversations relative to your contract proposal,
> where you committed to "Design and construct additional stop logs to allow
> a total of (4) gates to be under various stages of rehabilitation at one time."
> There is agreement on the value of this commitment, however, it remains
> unclear how it will be accomplished. $450,000.00 has been reduced in the
> mobilization CLIN [contract line item number] for uncompleted work.

4

> Further discussion on this topic will most likely be necessary in an effort to understand your intent.
> The baseline schedule for this project has not been approved. As a result, 10% retainage is being withheld as well.

*Id.* at 169.

In the spring of 2014, Dix submitted a revised baseline project schedule. In response, the Corps sent a letter acknowledging its receipt of the updated schedule. The letter noted, "as per the narrative, this schedule is based on four gates available to be dewatered at any one time and a non-work period of mid December to March 1." *Id*. at 29.

*Dix's subcontract with TIC*

In May 2013, Dix contacted TIC, requesting it provide a proposal to perform the surface preparation and recoating of the 28 gates on the Project. Dix stated, "[up] to four (4) gates with access systems" would be "under concurrent construction." *Id*. at 41.

TIC submitted its proposal for the subcontract work requested by Dix. The proposal noted, "[i]t is understood that as many as 4 gates will be available for work." *Id*. at 17. Soon after, Dix and TIC executed a subcontract agreement (Subcontract), memorializing the parties' rights and obligations. The Subcontract included the following provision:

> Subcontractor shall provide the Subcontract Work in strict accordance with the Main Contract, which has been made, and remains, available to Subcontractor for review, the provisions of which are expressly incorporated herein by this reference.

*Id*. at 109 (emphasis omitted).

*Project delays and negotiations over additional stoplogs*

TIC began work on the Project in the fall of 2013. Dix had not constructed any additional stoplogs, and Dix and TIC soon fell behind schedule. In October 2014, Dix sent an e-mail to TIC management informing them it was "pursuing pricing for an additional set of stoplogs for next year." *Id*. at 31. The e-mail further explained Dix was "pursuing the option with the [Corps] regarding payment for the stoplogs. . . ." *Id.*

In January 2015, Dix sent a letter to the Corps, with the subject "Stoplog Ice Mitigation Proposal—Window of Opportunity." *Id.* at 32. It noted that a month prior it had submitted a proposal for the fabrication of two sets of "additional stoplogs." *Id.* In the letter, Dix discussed various options for the material and construction of the stoplogs. Dix also expressed its belief that additional stoplogs were necessary for the success of the project.

Soon after, the Corps sent Dix a request for proposal (RFP). In its correspondence, the Corps requested Dix submit an RFP

>[i]ncorporating the enclosed design, fabrication, and delivery requirements into the contract for the additional stoplogs included in your original May 18, 2012 proposal. This RFP does not incorporate additional stoplogs into the contract. The additional stoplogs proposed in Volume 1, Tab 7, Page 7, Paragraph 8 "Comprehensive Work Plan" were accepted upon contract award and already are a contract feature. This RFP defines the government requirements for those stoplogs, which were undefined in the proposal and solicitation.

*Id*. at 193.

That same day, the Corps also sent Dix a letter noting that, as of January 2015, work on only 3 of the 28 gates had been completed with final acceptance of that work by the Corps still pending. As a result, the Corps formally advised Dix of the Corps's intention to terminate the contract for cause if Dix's default was not cured.

In February 2015, TIC sent a letter to Dix requesting over half a million dollars to compensate it for increased costs associated with delays it attributed it Dix's failure to provide concurrent four-gate access. TIC stated it was "willing and able to honor our price if the 4 gate cycle originally set forth in the schedule can be realized," and "urge[d] that every possible effort be made to make that a reality and avoid additional expense." *Id*. at 36.

The next month, Dix sent a letter to TIC in response to its request. It informed TIC that Dix had no contractual obligation to provide TIC with "unobstructed use of stoplogs to work on 4 gates at a time." *Id*. at 58. Dix acknowledged there were discussions

regarding the number of stoplogs that would be available at the time of negotiation, but the subcontract did not contain any language addressing the number of gates that would be available to TIC. Dix further noted TIC was bound by the Main Contract, which explicitly stated: "'There are a total of 18 stoplog sections. They are identical and interchangeable. Due to water heights, stoplogs can only be utilized at one, maybe two, spillway gates at one time.'" *Id*. at 58.

In April 2015, the Corps granted Dix's contract modification, in which it agreed to compensate Dix for the design, review, and construction of 18 new permanent stoplogs and granted a 458-day time extension. Also included was a global settlement of all requests for equitable adjustment.

By 2016, Dix constructed and delivered the additional stoplogs and TIC finished its work on the Project in August 2017.

*Litigation*

On August 8, 2017, TIC filed suit against Dix in Spokane County Superior Court under various causes of action, including breach of contract.[1] TIC alleged it was induced to present a proposal for work on the Project based on Dix's representation that TIC

---

[1] The other causes of action were unjust enrichment/quantum meruit, fraud, reformation or avoidance of contract, and breach of warranty of site availability.

would have concurrent access to four spillway gates. It further explained that due to the

lack of stoplogs, TIC was unable to stay on schedule and incurred additional costs.

In the spring of 2019, multiple people involved in the Project were deposed,

including Corps employee Lee McCormick, who served as the Project's contracting

officer. The following exchanges are relevant to this appeal:

> [COUNSEL FOR TIC:] . . . Is the proposal basically a submittal prepared by the contractors?
> [MCCORMICK:] Yes.
> [COUNSEL FOR TIC:] And that sets forth the work they are going to perform?
> [MCCORMICK:] I would not say the proposal sets forth the work. I would say the specifications set forth the work, but the proposal sets forth their plan for accomplishing it, who they are going to possibly team with, and their experience in doing that similar type of work.
> [COUNSEL FOR TIC:] And do those specifications become part of the contract?
> [MCCORMICK:] Yes.
> [COUNSEL FOR TIC:] And does the proposal become part of the contract?
> [MCCORMICK:] It can. I don't know if we incorporated it verbatim. There are times where we actually—when we award a contract we put that proposal incorporated into the contract. But in this case I don't believe we did.

*Id*. at 277-78.

> [COUNSEL FOR TIC:] The proposal, again, would be the document submitted by the contractor?
> [MCCORMICK:] Yes.

[COUNSEL FOR TIC:] And this specification is telling the contractor that the proposal submitted shall result in a binding contract without further action by either party. Do you see that?

[MCCORMICK:] Yes, I see that.

[COUNSEL FOR TIC:] And so as to this particular project, if, in fact, the contractor is awarded the project, the proposal would be part of and would constitute a binding contract between the government and the contractor?

[MCCORMICK:] We did not incorporate the proposal into the contract in this case.

[COUNSEL FOR TIC:] I'm just asking as to what—what this means.

[MCCORMICK:] So we issued a written award; so the part about or acceptance of proposal was not—we did accept a proposal. We issued a written award, which resulted in a binding contract.

*Id.* at 281-82.

[COUNSEL FOR TIC:] Okay. And looking at that Section 10 again it says "A written award or acceptance of proposal"—so I take that to mean either one—"mailed or otherwise furnished to the successful offeror"— which would be the contractor—"within the time specified in the proposal shall result in a binding contract without further action by either party."

Do you see that?

[MCCORMICK:] Yes.

[COUNSEL FOR TIC:] So regardless of whether it's a written award or acceptance of proposal, at least according to these specifications, it would result in a binding contract?

[MCCORMICK:] Yes. The contractor wouldn't have to re-sign. They wouldn't have to resubmit anything at that point if – once – once a written award was issued.

*Id.* at 219.

[COUNSEL FOR TIC:] And here in 8a . . . [the Dix] team proposes to design and construct additional stop logs to allow a total of four gates to be under various stages of rehabilitation at one time."

Do you see that?

[MCCORMICK:] Yes.

[COUNSEL FOR TIC:] And what did you take that to mean with respect to this proposal?

[MCCORMICK:] They would be able to accomplish more work simultaneously if they had more gates closed off for work.

[COUNSEL FOR TIC:] When a contractor submits a comprehensive work plan within their proposal like this, is the Corps relying upon this information in deciding whether or not to award the contract?

[MCCORMICK:] Yes. It's—we rely on the entire proposal. But, yeah, we would expect that, if somebody makes a statement like this, that it is followed through with.

[COUNSEL FOR TIC:] Meaning they are going to do it?

[MCCORMICK:] Yes.

*Id.* at 220-21.

[COUNSEL FOR TIC:] . . . Now, the government solicitation would be the specs we went through; correct?

[MCCORMICK:] Yes.

[COUNSEL FOR TIC:] And your offer would be the proposal; correct?

[MCCORMICK:] Yes.

[COUNSEL FOR TIC:] And this—this—and then it says "and this contract award. No further contractual document is necessary."

Do you see that?

[MCCORMICK:] That's correct.

[COUNSEL FOR TIC:] And, in fact, there are no further contract documents, are there?

[MCCORMICK:] Not for the award.

[COUNSEL FOR TIC:] So for the purposes of the award of the contract, if we were going to identify what the contract documents are or

were at the time, we've got the solicitation. We've got the offer of proposal. And that would be it?
            Is that right?
            [MCCORMICK:] Yes.

*Id.* at 223.

            [COUNSEL FOR TIC:] . . .Was it the position of the Corps in—as this project is proceeding that, in fact, [Dix] had committed to fabricating additional stop logs so that there could be four gates available at one time?
            [MCCORMICK:] Yes.
            [COUNSEL FOR TIC:] In fact, there's the position of the Corps that, in fact, they committed to doing that contractually; correct?
            [MCCORMICK:] That's correct.

*Id.* at 224.

Dix subsequently moved for summary judgment, arguing the parties' contract did not require Dix to construct additional stoplogs. TIC took the position that the additional stoplogs were part of the Main Contract between Dix and the Corps, and that the parties' Subcontract incorporated the Main Contract by reference. The superior court sided with Dix, reasoning Dix's Proposal (which mentioned constructing additional stoplogs) was not part of the Main Contract. The court thus granted summary judgment to Dix as to TIC's breach of contract claim.

*Arbitration*

After the court dismissed the breach of contract claim, TIC amended its complaint and the case proceeded to voluntary arbitration on TIC's claims of fraud, unjust

enrichment/quantum meruit, and promissory estoppel. In October 2021, the arbitrator

entered a final reasoned award, dismissing all of TIC's remaining claims and awarding

Dix attorney fees and costs. The arbitrator identified "[t]he main dispute in this

proceeding was generally whether Dix falsely represented to TIC that TIC would have

concurrent access to perform work on four gates on the Project." *Id*. at 557. The arbitrator

found "there was no promise from Dix to TIC prior to the Subcontract that Dix would

build additional stoplogs or provide concurrent four gate access." *Id*. at 564. The

arbitrator also determined TIC's productivity decreased following the eventual

construction of stoplogs by Dix in 2015, and that it had otherwise failed to establish with

any reasonable certainty damages related to the stop log issue.

The superior court confirmed the arbitrator's final reasoned award, awarded

$626,510.87 in attorney fees to Dix, and entered final judgment.

TIC timely appeals from the superior court's breach of contract summary judgment

ruling and the final judgment.

ANALYSIS

*Breach of contract*

The parties' contract dispute turns on whether the Subcontract obliged Dix to build

additional stoplogs. According to TIC, the parties' Subcontract incorporated the Main

13

Contract and the Main Contract required Dix to build additional stoplogs. Dix agrees the

parties' Subcontract incorporated the Main Contract, but disagrees that the Main Contract

included a requirement that Dix construct additional stoplogs.

The superior court resolved the parties breach of contract dispute on summary

judgment, which we review de novo. *Qwest Corp. v. City of Bellevue,* 161 Wn.2d 353,

358, 166 P.3d 667 (2007), *abrogated on other grounds by Cost Mgmt. Servs. Inc. v.

City of Lakewood*, 178 Wn.2d 635, 310 P.3d 804 (2013). When it comes to contract

interpretation, we follow the "objective manifestation theory" that focuses on the

"reasonable meaning" of the contract language "to determine the parties' intent." *Hearst

Commc'ns Inc. v. Seattle Times Co.,* 154 Wn.2d 493, 503, 115 P.3d 262 (2005). Extrinsic

evidence may be referenced to discern the parties' shared intent as to words and terms

used in a contract. *Hulbert v. Port of Everett,* 159 Wn. App. 389, 399-400, 245 P.3d 779

(2011). However, extrinsic evidence may not be used to vary, contradict, or modify the

written word. *Hearst,* 154 Wn.2d at 503.

Dix contends the Main Contract unambiguously did not require it to build

additional stoplogs. Dix acknowledges its Proposal contained an agreement to build

four stoplogs. However, Dix claims the Corps did not accept its proposal. Instead,

the Corps issued an award of contract that contained independent contract terms.

The parties both look to the wording of the Solicitation to support their interpretation of the Main Contract. Each point to parts of the Solicitation favoring their position.

Dix points to the Solicitation's statement that a contract would be formed by "[a] written award *or* acceptance of proposal." CP at 766 (emphasis added). Given the Corps subsequently issued Dix an "Award," *id*. at 270, Dix claims the Proposal did not become a part of the Main Contract. Further, because neither the Solicitation nor the final offer and award contained mention of additional stoplogs, Dix argues the Main Contract did not require Dix to provide additional stoplogs despite the fact that Dix had offered to do so in its Proposal.

TIC emphasizes language in the Solicitation that undercuts Dix's interpretation. For example, the Solicitation directed bidders to provide a comprehensive PMP that would "become an integral part of the resultant contract." *Id.* at 793. And the addendum to the Solicitation specifically states the "[t]he contract includes" . . . "the successful offeror's accepted proposal." *Id.* at 303. These provisions tend to indicate the Corps expected the contractor's bid proposal to be an integral part of the Main Contract.

We find the Solicitation's language ambiguous. Both parties have reasonable interpretations of the language set forth in the Solicitation. We therefore turn to extrinsic evidence.

A significant source of extrinsic evidence is the sworn deposition testimony of Lee McCormick. But unfortunately, Mr. McCormick's testimony on the meaning of the Main Contract is at times contradictory. Mr. McCormick initially stated the Proposal was not incorporated into the Main Contract. Yet later he stated Dix had committed to fabricating additional stoplogs, so as to allow for concurrent four-gate availability. Additionally, when TIC's counsel inquired as to whether the contract documents included the Proposal, Mr. McCormick answered in the affirmative. Mr. Lee's testimony does not help resolve the ambiguities in the Main Contract.

Another source of extrinsic evidence is the post-contract interactions between the Corps and Dix. But this is also ambiguous. In Dix's favor, the Corps issued Dix a contract modification, agreeing to pay for an additional 18 stoplogs. This modification would appear to be at least somewhat redundant if Dix had already agreed to provide additional stoplogs. But as TIC contends, the modification went beyond Dix's initial Proposal to simply "design and construct additional stop logs to allow [access to] a total of four (4) gates." *Id.* at 158. Furthermore, prior to the contract modification, the Corps issued letters

to Dix indicating it understood Dix was obliged to build additional stoplogs as set forth in its Proposal. *See id.* at 168 (December 10, 2012, letter indicating "additional stop logs identified in your technical proposal prior to award do not appear to be included."), and *id.* at 193 (January 26, 2015, letter indicating "additional stoplogs . . . were accepted upon contract award and already are a contract feature,").

The language in the Main Contract is ambiguous as to Dix's obligation to construct additional stoplogs. This ambiguity is not resolved by extrinsic evidence. Given this circumstance, genuine issues of material fact remain and Dix is not entitled to summary judgment on TIC's breach of contract claim.

*Collateral estoppel*

A complicating fact in this case is that, subsequent to the superior court's summary judgment decision, the parties engaged in arbitration and the arbitrator made several rulings against TIC, including a finding that TIC had failed to establish with any reasonable certainty damages as a result of the delay by Dix in building additional stoplogs. According to Dix, because a breach of contract claim requires the plaintiff to prove damages, the arbitrator's findings prevent TIC from prevailing on a breach of contract claim regardless of how we interpret the parties' contract.

17

Collateral estoppel bars relitigation of issues decided in a previous proceeding.

*Cristensen v. Grant County Hosp. Dist. No. 1*, 152 Wn.2d 299, 306, 96 P.3d 957 (2004).

The doctrine has several foundational prerequisites, including the requirement that the issue must be one that was actually litigated and necessarily determined in the prior proceedings. *Id.* at 307.

We agree with TIC that collateral estoppel does not bar its breach of contract claim based on the arbitrator's discussion of damages. The arbitrator's discussion on this issue came at the end of its written decision, after the arbitrator already ruled against TIC "on all [remaining] causes of action." CP at 566. There was no need to discuss damages at that point. The arbitrator's observations were purely dicta, unnecessary to the outcome of the case, and therefore, not necessarily determined. Collateral estoppel does not apply.

Also, the arbitrator's finding that Dix never promised additional stoplogs to TIC does not preclude TIC from advancing its breach of contract claim. The arbitrator's finding on this issue pertained to TIC's promissory estoppel claim. The breach of contract claim was not before the arbitrator. The finding has no bearing on TIC's claim for breach of contract, which is premised on the argument that the Main Contract between the Corps and Dix was incorporated into the subcontract between Dix and TIC.

No. 38679-1-III
*Thomas Indus. Coatings v. Dix Corp.*

Collateral estoppel does not bar TIC on remand from pursuing its breach of contract claim against Dix.

CONCLUSION

The summary judgment dismissal of the breach of contract claim, and final judgment, is reversed. We remand to the superior court for further proceedings. Dix's request for attorney fees is denied.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Pennell, J.

WE CONCUR:

_____
Fearing, C.J.

_____
Lawrence-Berrey, J.

19