216 P.3d 1029 (2009)
VONAGE AMERICA, INC., for itself and as a wholly-owned subsidiary of Vonage Holding Corp. and as successor in interest to Vonage USA, Inc., Appellant/Cross-Respondent,
v.
CITY OF SEATTLE, Director of Department of Executive Administration, Division of Revenue and Consumer Affairs, and City Of Seattle, Office of the Hearing Examiner, Respondents/Cross-Appellants.
No. 63234-5-I.
Court of Appeals of Washington, Division 1.
July 6, 2009.
Publication Ordered September 3, 2009.
*1030 Robert L. Mahon, Perkins Coie LLP, Seattle, WA, Peter B. Kanter, James P. Kratochvill, Thomas H. Steele, Morrison & Foerster LLP, San Francisco, CA, for Appellant.
Kent C. Meyer, Seattle City Attorney's Office, Seattle, WA, for Respondents.
LAU, J.
¶ 1 In this appeal, Vonage America, Inc., disputes the City of Seattle's telephone utility tax assessment of $131,435.55. The City based the assessment on the estimate of Vonage's revenue from its provision of intrastate Voice over Internet Protocol (VoIP) service. Vonage contends the assessment is erroneous because (1) it is not authorized under RCW 35.21.714 because VoIP service is "interstate" as a matter of law, (2) the *1031 State's "Internet Tax Moratorium" exemption applies, and (3) Vonage lacks a substantial nexus with the City under the federal commerce clause. Vonage appealed the assessment to the superior court, which rejected these arguments, but nevertheless vacated the assessment and remanded for redetermination of the tax amount due. Because Vonage established the assessment was erroneous, the superior court required the City to produce substantial evidence to show the tax assessment was based on the intrastate component of Vonage's VoIP service. Both parties appeal. We affirm.

FACTS
¶ 2 Vonage provides VoIP service to its customers, including residents of Seattle. VoIP technology enables consumers to conduct voice communications (calls) via a highspeed (broadband) Internet connection. Vonage's service also includes voicemail, call waiting, call forwarding, and caller identification to allow its customers to control how their calls are sent, received, and stored. Vonage's customers must purchase the broadband connection from a separate company, usually a telecommunications or cable television company.[1] To use Vonage's VoIP service, customers must purchase special software through Vonage's website or they must acquire a "plug-and-play" device (VoIP device), which they can purchase from third party retail stores or obtain from Vonage's website at no cost.
¶ 3 When a customer initiates a call, the software or VoIP device converts the customer's outgoing analog audio signal into digital data packets. The customer's Internet service provider then carries the digital data to a "gateway" computer. The gateway computers hold information regarding Vonage's customers and use the information to authenticate whether the data is from a valid Vonage customer.
¶ 4 If the call recipient is also a Vonage customer, the digital data is transmitted directly over the Internet through the recipient's broadband connection to the recipient's computer. This is similar to the way in which e-mail communications are sent and received. The recipient's VoIP device or software then converts the incoming digital data into an analog audio signal, enabling the recipient to hear the call.
¶ 5 However, if the recipient is not a Vonage customer, the digital data is processed through one of several regional data centers. These centers convert the digital data into an analog audio signal, which is then directed to the Public Switched Telephone Network (PSTN). Vonage contracts with its affiliate, Vonage Networks, Inc., which provides services that allow for VolP-to-PSTN and PSTN-to-VolP calls. In turn, Vonage Networks purchases telephone communication services from traditional telephone companies that complete the communication to the recipient. In Seattle, WilTel Communications and Global Crossing provided these services during the disputed period. When a non-Vonage customer calls a Vonage customer, the process occurs in reverse order.
¶ 6 Before it initiates service, Vonage also requires its customers to provide a valid credit card number and billing address. It typically bills the customers monthly. The bills identify "telephone" numbers assigned to the call initiator and recipient. Although these numbers contain a three-digit area code like traditional telephone numbers, Vonage customers can choose any area code they wish, even if it is not geographically matched to their billing address or where they reside. Vonage's VoIP service is nomadic because its customers can use the service anywhere in the world they have access to the Internet, without having to change their VoIP telephone numbers. Nevertheless, Vonage requires its customers to register their street address for routing emergency communications. And Federal Communications Commission ("FCC") regulations require VoIP providers to obtain location information from their customers before initiating service and provide a mechanism for customers to update their location information if their location *1032 changes.[2]
¶ 7 Sometime in December 2002, Vonage began selling VoIP service to Seattle residents. Acting through advertising agencies, Vonage purchased promotional materials that were broadcast or circulated in Seattle through television, radio, or newspapers. But Vonage did not own or lease any property or employ any employees in Seattle during this period. When the City audited Vonage for the period between December 1, 2002, and December 31, 2005, it determined that Vonage was subject to the City's telephone utility tax. Therefore, on May 18, 2006, the City issued a tax assessment of $131,435.55. In computing the assessment, the City relied on Vonage customer billing addresses and emergency response registrations in Seattle to determine Vonage's gross revenue subject to tax. The City deducted Vonage's revenue from interstate calls in order to limit the tax assessment to revenue from intrastate calls.[3]
¶ 8 The City estimated a revenue deduction of approximately three percent for the interstate calls based on usage charges obtained from an August 2005 invoice from WilTel to Vonage. However, this invoice reflected WilTel's charges to Vonage for traditional landline calls made by potential and new customers to Vonage's toll free customer service number. It is undisputed that this invoice did not reflect Vonage's interstate service revenues. In response, Vonage produced a different August 2005 invoice from WilTel that showed terminating VolP-to-PSTN calls for Vonage customers to establish the correct proportion of interstate to intrastate calls. But the City's auditor did not receive this invoice because it was too large to be delivered through the City's e-mail system.
¶ 9 On June 16, 2006, Vonage appealed the assessment to the Seattle hearing examiner, contending that it was not subject to the City's telephone utility tax and, alternatively, that the assessment amount was erroneous. At the hearing, Vonage presented a "traffic study" based on five WilTel invoices, from which it estimated that 81.73 percent of calls by Vonage customers carried over WilTel's communications network were interstate and only 18.27 percent were intrastate. After the evidentiary hearing, the hearing examiner concluded that Vonage was subject to the tax. The hearing examiner also found that neither the August 2005 invoice relied on by the auditor nor Vonage's traffic study accurately reflected the revenue derived from intrastate as opposed to interstate Seattle calls. Nevertheless, the hearing examiner affirmed the assessment, concluding that under the Seattle Municipal Code, it was Vonage's burden to establish the correct tax amount.
¶ 10 Vonage sought appeal by writ of review to the superior court. The superior court concluded Vonage was subject to the City's telephone utility tax, but that the tax assessment impermissibly included charges for interstate activity. It vacated the assessment and held that on remand, "the City must show by substantial evidence that the taxes being assessed are for intrastate services only." Vonage and the City appeal.[4]

ANALYSIS

Vonage is Subject to the City's Telephone Utility Tax
¶ 11 Vonage appealed the hearing examiner's decision under a writ of review as authorized *1033 by RCW 7.16.120. On review from such an appeal, this court reviews issues of law de novo and issues of fact for substantial evidence. Gen. Motors Corp. v. City of Seattle, 107 Wash.App. 42, 47, 25 P.3d 1022 (2001). Neither Vonage nor the City assign error to the hearing examiner's factual findings, so they are verities on appeal. Gen. Motors, 107 Wash.App. at 47, 25 P.3d 1022.
¶ 12 The City's telephone utility tax is a tax on the privilege of engaging in telephone business in Seattle. SMC 5.48.050A. The City defines "telephone business" broadly to include more than traditional telephone service.

"Telephone business" means the providing; by any person of access to a local telephone network, local telephone network switching service, toll service, cellular or mobile telephone service, coin telephone services, pager service or the providing of telephonic, video, data, or similar communication or transmission for hire, via a local telephone network, toll line or channel, cable, microwave, or similar communication or transmission system. The term includes cooperative or farmer line telephone companies or associations operating exchanges. The term also includes the provision of transmission to and from the site of an internet provider via a local telephone network, toll line or channel, cable, microwave, or similar communication or transmission system....
SMC 5.30.060(C) (emphasis added). Before the hearing examiner, Vonage argued that it did not qualify as a telephone business under this provision, contending instead that it should be treated as a provider of additional Internet services. On appeal, Vonage does not dispute that its service falls under the City's definition of telephone business. Rather, it argues that the City's tax is not authorized under state law.
¶ 13 "A municipal corporation's authority to tax must be delegated by the state legislature." Cmty. Telecable of Seattle, Inc. v. City of Seattle, 164 Wash.2d 35, 41, 186 P.3d 1032 (2008). RCW 35.21.714(1) grants cities the authority to impose telephone utility taxes.

Any city which imposes a license fee or tax upon the business activity of engaging in the telephone business which is measured by gross receipts or gross income may impose the fee or tax, if it desires, on one hundred percent of the total gross revenue derived from intrastate toll telephone services subject to the fee or tax: PROVIDED. That the city shall not impose the fee or tax on that portion of network telephone service which represents charges to another telecommunications company, as defined in RCW 80.04.010, for connecting fees, switching charges, or carrier access charges relating to intrastate toll telephone services, or for access to, or charges for, interstate services, or charges for network telephone service that is purchased for the purpose of resale, or charges for mobile telecommunications services provided to customers whose place of primary use is not within the city.
(Emphasis added.)
¶ 14 Vonage contends that this statute prohibits Seattle from imposing any telephone utility tax against it because its service is interstate and cities cannot impose the tax on "access to, or charges for, interstate service." RCW 35.21.714(1). The City counters that it only seeks to tax the revenue Vonage derives from the intrastate component of its service, i.e., calls originating and terminating within Washington state. But Vonage argues that its entire service is interstate as a matter of law, regardless of any intrastate usage of its service as a matter of fact. It relies on Qwest Corp. v. City of Bellevue, 161 Wash.2d 353, 166 P.3d 667 (2007) to assert that "a telephone service is characterized as `interstate' if such service is subject to federal (FCC) regulatory jurisdiction rather than state ... jurisdiction, and [] the courts should not parse the intrastate versus interstate usage of a service once the service is determined to be `interstate.'"[5] Appellant's Opening Br. at 15.
*1034 ¶ 15 Vonage's argument depends entirely on its reading of Qwest. At issue was the City of Bellevue's attempt to tax revenue that Qwest obtained from certain charges paid by its customers. Qwest, 161 Wash.2d at 359, 166 P.3d 667. Specifically, the charges consisted of "customer access line charges," and "private line," "frame relay," and "ATM or asynchronous transfer mode" charges. Qwest, 161 Wash.2d at 356, 166 P.3d 667. These charges were federally tariffed charges imposed pursuant to FCC regulations to compensate Qwest for providing its customers access to the national interstate telephone system.[6]Qwest, 161 Wash.2d at 360 n. 11, 166 P.3d 667. While Qwest's customers could use its service to place both intrastate and interstate telephone calls, under FCC rules, Qwest could only levy the access charges when its customers indicated that they planned to use the service for at least 10 percent interstate calls. Qwest, 161 Wash.2d at 361, 166 P.3d 667.
¶ 16 The City of Bellevue ("Bellevue") argued that it should be able to tax some of Qwest's revenue from the charges because in some cases, customers were not using the service for interstate calls at all. It pointed to its own invoices from Qwest, which showed frame relay charges for certain dedicated lines the city government used only to connect various offices with each other, entirely within Washington state. Qwest, 161 Wash.2d at 360, 166 P.3d 667. In essence, Bellevue argued that because its actual usage of the lines was entirely intrastate, the revenue Qwest derived from the frame relay charges was not for providing interstate service. Therefore, the revenue should be subject to Bellevue's uncontested authority to tax Qwest for its provision of intrastate telephone service. Qwest, 161 Wash.2d at 359-60, 166 P.3d 667.
¶ 17 The Washington Supreme Court rejected this argument, holding that the revenue Bellevue sought to tax derived from Qwest's interstate service as a matter of law. It emphasized that under FCC rules, the charges were based on "the customer's initial indication of how they plan to use the service and not how the service is subsequently used." Qwest, 161 Wash.2d at 361, 166 P.3d 667. Because the charges at issue were defined by federal tariff as being for interstate service, imposed in exchange for providing access to the national interstate telephone system, the court concluded they were "interstate" as a matter of law regardless of the actual use of the service. Qwest, 161 Wash.2d at 361-62, 166 P.3d 667. The court did not hold, as Vonage contends, that by being subject to FCC regulatory jurisdiction, a service that is used for both intrastate and interstate calls is entirely "interstate" as a matter of law for municipal taxation purposes.[7] The court's limited holding applied only to the federally tariffed charges at issue in that case.
¶ 18 But Vonage argues that its service is covered by Qwest's holding even though it is not subject to federal tariff filing requirements. It points to the court's statement that "all interstate services are exempt from taxation, not simply those for which rates are contained in tariffs filed with the FCC." Qwest, 161 Wash.2d at 362, 166 P.3d 667. This statement, however, did not relate to whether a service with both interstate and *1035 intrastate components is "interstate" as a matter of law. Rather, in context, this statement represents a different holding made in response to a different argument.
¶ 19 Bellevue argued that RCW 35A.82.060's bar on taxes "`"for access to, or charges for, interstate services"'" was not triggered because an FCC tariff defined the service as interstate.[8]Qwest, 161 Wash.2d at 362, 166 P.3d 667. It noted that a prior version of RCW 35A.82.060 had prohibited cities from imposing the tax on "`access to, or charges for, interstate services for which rates are contained in tariffs filed with the federal communications commission.'" Qwest, 161 Wash.2d at 362, 166 P.3d 667 (quoting Laws of 1983, 2d Ex.Sess., ch. 3, § 38). Bellevue argued that by omitting the italicized language, the legislature intended to prohibit taxes only on services that were in fact interstate, without regard to the existence of FCC tariffs. Qwest, 161 Wash.2d at 362, 166 P.3d 667. The court rejected this argument and read the omission as an expansion of the tax prohibition rather than a limitation on it. "[U]nder the amended version of the statute, all interstate services are exempt from taxation, not simply those for which rates are contained in tariffs filed with the FCC." Qwest, 161 Wash.2d at 362, 166 P.3d 667. Thus, the statement Vonage relies on does not mean that services subject to federal regulation but not tariff filing requirements are interstate as a matter of law. Rather, it was a statement that the State's prohibition on municipal taxation of services that are interstate is not limited to those that are subject to federal tariffs. Here, for example, RCW 35.21.714 bars the City from taxing the interstate component of Vonage's VoIP service even though it is not required to file tariffs with the FCC. This is consistent with the superior court's ruling that the City can tax Vonage only for intrastate activity.
¶ 20 In sum, Qwest did not hold that services like Vonage's are interstate as a matter of law regardless of the actual service usage. Under RCW 35.21.714, cities have the option of taxing the intrastate component of such services. See Qwest, 161 Wash.2d at 359, 166 P.3d 667 ("It is undisputed that under state law, the City may tax Qwest's charges for and its provision of access to intrastate services."). However, the City may not tax the interstate component of Vonage's VoIP service.[9]See Qwest, 161 Wash.2d at 362, 166 P.3d 667 ("all interstate services are exempt from taxation.") We hold the superior court properly concluded that Vonage is subject to the City's telephone utility tax but the assessment must be based on the intrastate component of Vonage's service.

Internet Tax Moratorium
¶ 21 Vonage also argues that the City's tax assessment is barred by another state statute, RCW 35.21.717, the "Internet Tax Moratorium." This statute provides,
Until July 1, 2006, a city or town may not impose any new taxes or fees specific to internet service providers. A city or town may tax internet service providers under generally applicable business taxes or fees, at a rate not to exceed the rate applied to a general service classification. For the purposes of this section, "internet service" has the same meaning as in RCW 82.04.297.
In turn, RCW 82.04.297(3) defines "internet service."
a service that includes computer processing applications, provides the user with *1036 additional or restructured information, or permits the user to interact with stored information through the internet or a proprietary subscriber network. "Internet service" includes provision of internet electronic mail, access to the internet for information retrieval, and hosting of information for retrieval over the internet or the graphical subnetwork called the world wide web.
¶ 22 Vonage contends its VoIP service is an Internet service because it has technological similarities to the transmission of e-mail communications. It relies on Community Telecable of Seattle v. City of Seattle, 164 Wash.2d 35, 186 P.3d 1032 (2008), which held that Comcast's broadband cable modem business qualified as an Internet service, exempt from tax under the moratorium. But unlike Comcast, Vonage does not provide its customers with access to the Internet. It is undisputed that Vonage's customers must purchase a broadband Internet connection from a separate company. Thus, while Vonage's VoIP service is delivered through the Internet and has some similarities to e-mail, it is not an Internet service provider, exempt from tax under RCW 35.21.717.

Nexus
¶ 23 Vonage also argues that the federal commerce clause bars the City's tax because its contacts with Seattle were insufficient to establish a "substantial nexus" with the City. The commerce clause authorizes Congress to "regulate commerce ... among the several states." U.S. CONST. art I, § 8, cl. 3. The United States Supreme Court has interpreted this provision to prohibit certain state actions that interfere with interstate commerce, even in the absence of direct action by Congress. Quill Corp. v. North Dakota, 504 U.S. 298, 309, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992). In Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 279, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977), the Court held that a state tax would withstand a commerce clause challenge when the tax "is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State." In Tyler Pipe Industries, Inc. v. Washington State Department of Revenue, 483 U.S. 232, 250, 107 S.Ct. 2810, 97 L.Ed.2d 199 (1987), the Court addressed whether the actions of Tyler Pipe's independent contractors in the state could satisfy the substantial nexus requirement and justify imposition of Washington's business and occupation tax on the company. The Court approved the following nexus test: "`[T]he crucial factor governing nexus is whether the activities performed in this state on behalf of the taxpayer are significantly associated with the taxpayer's ability to establish and maintain a market in this state for the sales.'" Tyler Pipe, 483 U.S. at 250, 107 S.Ct. 2810 (quoting Tyler Pipe Indus., Inc. v. Dep't of Revenue, 105 Wash.2d 318, 323, 715 P.2d 123 (1986)).
¶ 24 Vonage argues that under Quill, a case that postdates Tyler Pipe, it lacks a substantial nexus with Seattle because it has no physical presence in the City. In Quill, the Court considered whether North Dakota's use tax on an out-of-state mail-order business unduly burdened interstate commerce. Quill, 504 U.S. at 301, 112 S.Ct. 1904. The Court concluded that the business lacked a substantial nexus with the State because it maintained no physical presence in the state, only contacting its North Dakota customers via mail or common carrier. Quill, 504 U.S. at 304, 311, 315, 112 S.Ct. 1904. Consequently, the commerce clause barred the State from collecting the use tax. Quill, 504 U.S. at 311, 112 S.Ct. 1904.
¶ 25 But it is not clear that a physical presence requirement for nexus applies beyond sales and use taxes. See Quill, 504 U.S. at 314, 112 S.Ct. 1904 ("we have not, in our review of other types of taxes, articulated the same physical-presence requirement that [National] Bellas Hess[, Inc. v. Department of Revenue of Ill., 386 U.S. 753, 87 S.Ct. 1389, 18 L.Ed.2d 505 (1967)] established for sales and use taxes"). Some decisions since Quill have extended the physical presence requirement to other kinds of taxes whereas others have declined to do so. See, e.g., J.C. Penney Nat'l Bank v. Johnson, 19 S.W.3d 831, 839 (Tenn.Ct.App.1999) (applying physical presence test to franchise and excise taxes). *1037 Geoffrey, Inc. v. S. Carolina Tax Comm'n, 313 S.C. 15, 437 S.E.2d 13 (1993) (declining to extend physical presence test in context of income and business license taxes). In General Motors Corp. v. City of Seattle, 107 Wash.App. 42, 55, 25 P.3d 1022 (2001), this court "declin[ed] to extend Quill's physical presence requirement" in the context of the City's business and occupation tax.[10] In Ford Motor Co. v. City of Seattle, 160 Wash.2d 32, 43, 156 P.3d 185 (2007), the court noted that it denied review of General Motors and that the Ford holding was consistent with its other decisions.
¶ 26 While there is no evidence that Vonage owned or leased property in Seattle or that it had employees in Seattle during the audit, it obtained a sufficient physical presence in the city by purchasing the right to use telephone lines in Seattle through its affiliate, Vonage Networks, Inc. And Vonage advertised its VoIP service in Seattle to "establish and maintain a market" in the city. Vonage sold its service to Seattle customers with Seattle billing addresses. This is sufficient to establish the requisite nexus. See Mayor & City Counsel v. Vonage Am., Inc., 569 F.Supp.2d 535, 538 (2008) ("in the context of Vonage's nomadic VoIP, the presence of a billing address in the taxing locality is sufficient to constitute a `substantial nexus.'").

Cross-Appeal
¶ 27 The City argues that Vonage failed to prove the correct tax amount due and that the superior court erroneously shifted the burden of establishing this amount to the City. The City relies on SMC 5.55.140B: "The Director's assessment or refund denial shall be regarded as prima facie correct, and the person shall have the burden to prove that the tax assessed or paid by him is incorrect, either in whole or in part, and to establish the correct amount of tax." The City concedes that Vonage satisfied its burden of proving that the City's tax assessment was incorrect. Nevertheless, the City contends that Vonage is required to pay this incorrect assessment in full because it failed to satisfy its burden of proving the correct tax amount. The City's argument mirrors the hearing examiner's analysis.
The Director also attempted to include only intrastate service revenues in calculating the tax owed. The evidence presented by Vonage shows that the August 2005 WilTel invoice used by the Department to estimate interstate service revenues was not related to the use of service by Vonage's customers. Thus, the assessment may be inaccurate, since this invoice did not reflect interstate service revenues. However, Vonage's "traffic study" of minutes does not establish how much of the contested revenues were related to interstate services; the five-month traffic study does not identify the calls that are "interstate," e.g., which originated in Seattle and terminated outside the state. Because of the bundled nature of Vonage's records, it is clearly difficult for the company to provide this information after the service has occurred, but the Code places the burden on the taxpayer to establish the correct amount of tax, if the Director's assessment is to be modified. Vonage has not met its burden to establish the correct amount of tax, as required under SMC 5.55.140. Thus, the Department's assessment and calculation of tax must be affirmed.
¶ 28 But as the superior court correctly observed, applying the City's burden-shifting procedure under these facts would result in Vonage paying tax on revenues that are indisputably from the interstate component of its service. Yet the state statute authorizing imposition of the tax specifically prohibits the imposition of such tax. See *1038 RCW 35.21.714(1) ("[T]he city shall not impose the fee or tax ... for access to, or charges for, interstate services."). The City cannot use SMC 5.55.140B to obtain greater taxing ability than the legislature has delegated it. See Cmty. Telecable of Seattle, Inc. v. City of Seattle, 164 Wash.2d 35, 41, 186 P.3d 1032 (2008) (municipal corporation's taxing authority derives from State).
¶ 29 Additionally, the City argues that it should not be required to bear the burden of proving the correct amount of the tax on remand. Instead, the taxpayer should bear the burden because it "holds the information and is in the best position to divide its revenue between taxable and nontaxable activities."[11] Cross-Appellant's Reply Br. at 4. But the City misreads the superior court's holding. The superior court determined that there was insufficient evidence to support the City's tax assessment. "The invoice that the City used to determine the ratio of interstate to intrastate calls had nothing to do with use of the VoIP service; rather it was related to calls made to Vonage's customer service number." The superior court remanded with instructions for the City to produce substantial evidence that its taxes were based on intrastate usage of Vonage's VoIP service. And afterwards, the burden would fall on Vonage to establish the correct tax amount. The superior court did not impose on the City the burden to establish the correct tax amount. But it did require the City to base its assessment on a genuine estimate of Vonage's intrastate activity rather than on a mistakenly submitted invoice that had nothing to do with the ratio of interstate to intrastate calls.[12]
¶ 30 On remand, the City must produce substantial evidence that its tax assessment is based on the intrastate component of Vonage's VoIP service, i.e., an estimate of calls initiated and terminated within Washington state. Once this burden is met, it falls on Vonage to demonstrate that the estimate is inaccurate and to establish a more accurate estimate.[13]
¶ 31 We affirm.
WE CONCUR: APPELWICK and AGID, JJ.
NOTES
[1] Both parties agree that "Vonage does not function as an [Internet Service Provider], nor does it offer or provide its customers directly or indirectly with access to the Internet."
[2] In accordance with these requirements, Vonage's user agreement requires its customers to keep their location information updated. "For each phone number that you use for the Service, you must register with Vonage the physical location where you will be using the Service with that phone number. When you move the Device to another location, you must register your new location." However, Vonage asserts that it has no way to police this requirement or determine if the location information provided by the customer is accurate. In its regulations, the FCC agreed "that it currently is not always technologically feasible for providers of interconnected VoIP services to automatically determine the location of their end users without end users' active cooperation." Vonage also contends that it is impossible to determine exactly what proportion of calls enabled through its service are intrastate versus interstate in nature.
[3] The City made this deduction because RCW 35.21.714, which authorizes the imposition of the City's telephone utility tax, prohibits the City from imposing the tax "for access to, or charges for, interstate services."
[4] Vonage sought direct review by the Washington Supreme Court, and the City cross-appealed. The supreme court denied review.
[5] It is undisputed that Vonage's VoIP service is subject to FCC regulatory jurisdiction. See In re Vonage Holdings Corp. Petition, 19 F.C.C.R. 22404 ¶ 1 (2004). But, as Vonage concedes, this fact alone does not preclude state or municipal taxation of its service as a matter of federal law. Indeed, the FCC has specifically declined to preempt local taxation of Vonage's VoIP service. Id. Thus, Vonage's argument rests entirely on its contention that under Qwest, telephone services subject to FCC jurisdiction must be deemed completely "interstate" as a matter of state law.
[6] A "tariff" in this context is defined as "Schedules of rates and regulations filed by common carriers." 47 C.F.R. § 61.3(rr) (2008). Under 47 U.S.C. § 203, common carriers like Qwest are required to file their rates, or tariffs, with the FCC. Qwest, 161 Wash.2d at 362, 166 P.3d 667.
[7] Vonage relies primarily on this passage of the court's opinion: "To summarize, whether the FCC or the WUTC [Washington Utilities and Transportation Commission] has jurisdiction over certain charges (i.e., whether the charges are for access to interstate or intrastate service) is not determined by looking to the customer's use of the connections. Instead, whether charges are charges for access to interstate (as opposed to intrastate) service is a question of law, and the City's contention that a court must conduct factual analysis to determine the interstate or intrastate nature of the charges is erroneous." Qwest, 161 Wash.2d at 361, 166 P.3d 667. But the charges being discussed in this passage are federally tariffed charges, a point critical to the court's holding.
[8] The only difference between RCW 35A.82.060 and 35.21.714 is that the former is applicable to code cities, whereas the latter applies to noncode cities like Seattle. Qwest, 161 Wash.2d at 363 n. 12, 166 P.3d 667.
[9] Vonage also argues that it is impossible to determine the exact ratio of interstate to intrastate calls and that the Seattle billing addresses and emergency contact information could be inaccurate in some cases. Consequently, Vonage argues, it should not have to pay the City's telephone utility tax at all. We reject this argument. Assuming that Vonage is correct that there is inevitably some degree of imprecision in determining the revenue from its Seattle intrastate VoIP service, that imprecision does not exempt it from the obligation to pay the City's tax. We note that this is not the only situation where there is an absence of complete mathematical certainty, yet taxation is still required. See, e.g., Washington Beef, Inc. v. County of Yakima, 143 Wash.App. 165, 168, 177 P.3d 162 (2008) (noting that "[s]etting the value of assets for the purpose of assessing property taxes is more of an art than a science.").
[10] Vonage contends that this statement is dicta because physical presence was established by the company's sales representatives, who visited the city on a monthly basis. But the court's substantial nexus discussion did not rely on these visits alone or discuss the physical presence requirement in connection with the sales representatives. Instead, its conclusion that General Motors had a substantial nexus with the City was based on the "market" test described in Tyler Pipe. "We are satisfied that in this case, the collective activities of each automaker are strategically designed to maximize their sales within the City and that the absence of these activities would significantly affect their ability to maintain a share of the Seattle market." Gen. Motors, 107 Wash.App. at 53, 25 P.3d 1022.
[11] The accuracy of this general proposition is very much in doubt in this case. The FCC has determined that VoIP is difficult if not impossible to accurately segregate into interstate and intrastate use. See In re Vonage Holdings Corp., 19 F.C.C.R. 22404 ¶ 29 (2004). Courts have reached the same conclusion. See, e.g., Vonage Holdings Corp. v. Nebraska Pub. Serv. Comm'n, 564 F.3d 900, 905 (8th Cir. 2009) (concluding that impossibility exception, which applies when a service otherwise subject to dual regulation is impossible or impractical to separate into interstate and intrastate components, justified FCC's preemption of state regulation of Vonage). And the hearing examiner here acknowledged, "[I]t is clearly difficult for [Vonage] to provide this information."
[12] In its memorandum opinion, the court expressed its confidence that the City could meet this minimal requirement. "[T]his court is persuaded by the following statement made by the auditor during cross-examination that an authorized tax can be established: `And if it was necessary to allow them an interstate deduction even though they are bundling it together, I do see how we could use something like that [traffic] study.'" We note that the invoice Vonage submitted to the auditor, which was too large to be delivered through the City's e-mail system, might also provide a sufficient basis to show that its assessment is for the intrastate component of Vonage's service.
[13] Vonage presented evidence to the hearing examiner suggesting that 81.73 percent of calls by Vonage customers carried over WilTel's communications network were interstate and only 18.27 percent were intrastate. The hearing examiner concluded that this evidence failed to accurately establish Vonage's revenues from the interstate component of its service because the evidence did not identify the calls originating from Seattle and terminating outside the state. But the mere fact that Vonage's efforts to establish the correct amount of tax rely on estimates does not render them ineffective. The City essentially argues that Vonage should have to pay an obviously inflated amount because it did not prove exactly how much less it owes. We reject this argument. While it may be difficult to prove the interstate to intrastate ratio with precision, the City's tax should be based on a reasonable estimate of Vonage's revenue from the intrastate component of its service. We note that the FCC has dealt with the difficulty of determining the actual proportion by conducting "traffic studies" and establishing a "safe harbor" of 64.9 percent, which approximates the percentage of VoIP revenues from interstate calls and that this approach was upheld in Vonage Holdings Corp. v. Federal Communications Commission, 489 F.3d 1232 (D.C.Cir.2007).